**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Grand Canyon Skywalk Development, LLC, a Nevada limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>'SA' NYU WA, a tribally-chartered corporation established under the laws of the Hualapai Indian Tribe, et al.,<br><br>Defendants. | No. CV12-8030-PCT-DGC<br><br>**ORDER** |

    This is the second order the Court has entered on Plaintiff's request for a temporary restraining order ("TRO"). The factual background of this case is described in the Court's earlier order (Doc. 32) and will not be repeated here.

    Plaintiff asks the Court to declare that the Hualapai Indian Tribe has no authority to condemn Plaintiff's private contract rights in the Skywalk Agreement and that its condemnation ordinance is invalid. Doc. 1. Plaintiff seeks a TRO barring Defendants "from taking any steps to enforce the Tribe's purported 'condemnation' of Plaintiff's interest in the operation of the Grand Canyon Skywalk." Doc. 4 at 1-2.

    Plaintiff argues that it is not required to exhaust its remedies in Hualapai Tribal Court because several exceptions to exhaustion apply. The Court's order of February 28, 2012, found that Plaintiff had failed to show that two of the exceptions apply – that it is "plain" that the Tribal Court lacks jurisdiction or that exhausting the issue of jurisdiction in the Tribal Court will be futile. Doc. 32 at 3-5. The Court found, however, that

Plaintiff had made a colorable claim that the bad faith exception to the exhaustion requirement applies. *Id.* at 6. The Court ordered the parties to provide additional briefing (Doc. 32 at 6), and the parties filed supplemental briefs (Docs. 35, 36). At Plaintiff's request, the Court also held a hearing on March 14, 2012, where it received additional factual information from the parties regarding recent activities related to the condemnation effort.

For the reasons stated below, the Court concludes that the bad faith exception to exhaustion does not apply. The Court therefore will deny Plaintiff's motion for a TRO, require Plaintiff to exhaust its jurisdictional arguments in Tribal Court, and stay this action.

## II.     The Bad Faith Exception.

Plaintiff argues vigorously that the Court should, in the interest of equity, intervene and prevent the tribe from perpetrating an injustice that is destroying the value of Plaintiff's Skywalk investment and will leave Plaintiff with little ability to recoup its losses. Although the Court is mindful of the equitable arguments Plaintiff has made, this is not a Court of Chancery charged with broad ranging equitable powers. The Court must respect the principle of comity the Supreme Court has applied – and has instructed lower courts to apply – to sovereign Indian tribes. Comity requires that examination of the existence and extent of a tribal court's jurisdiction "be conducted in the first instance in the Tribal Court itself." *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 856 (1985). "[T]he federal policy supporting tribal self-government directs a federal court to stay its hand in order to give the tribal court a full opportunity to determine its own jurisdiction." *Iowa Mut. Ins. Co. v. LaPlante,* 480 U.S. 9, 16 (1987) (quotation marks and citation omitted). This is particularly true when litigation concerns the validity of a tribal ordinance – an issue that goes to the heart of tribal self-government and self-determination. The "tribe must itself first interpret its own ordinance and define its own jurisdiction." *Burlington N. R.R. Co. v. Crow Tribal Council*, 940 F.2d 1239, 1246 (9th Cir. 1991).

Exhaustion in tribal court is not required where "an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith." *Burlington N. R.R. Co. v. Red Wolf,* 196 F.3d 1059, 1065 (9th Cir.1999). Plaintiff argues vehemently that Defendants have engaged in bad faith in this case, but Plaintiff's arguments focus primarily on the conduct of the Hualapai Tribal Council and its attorneys and only incidentally on the actions of the Tribal Court. For the reasons that follow, the Court concludes that the bad faith exception is not as broad as Plaintiff contends – that it is meant to apply primarily to actions of the Tribal Court, not the actions of litigants or other branches of tribal government.

### A.     The Source of the Exception.

The Supreme Court first recognized the bad faith exception in *National Farmers*. 471 U.S. at 857 n. 21. The Court stated that exhaustion would not be required "where an assertion of tribal jurisdiction 'is motivated by a desire to harass or is conducted in bad faith.'" *Id.* (quoting *Juidice v. Vail*, 430 U.S. 327, 338 (1977)). The Court gave no guidance as to what it meant by "an assertion of tribal jurisdiction," but it adopted the standard from the *Younger* abstention case of *Juidice v. Vail*. A review of *Juidice* suggests that the exception looks to the assertion of jurisdiction by the Tribal Court.

In *Juidice*, the Supreme Court held that a federal district court must abstain from exercising jurisdiction over a state court defendant's constitutional challenge to a contempt order the state court issued after the defendant failed to appear. 430 U.S. at 330. Applying principles of comity, the Supreme Court held that as long as the defendant had the opportunity to raise his federal claims in state court, the federal court should abstain from interfering. *Id.* at 337. *Juidice* recognized a bad faith exception to this abstention requirement, stating that abstention is not required where the federal court finds that "the state proceeding" is motivated "by a desire to harass or is conducted in bad faith[.]" *Id.* at 338 (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 611 (1975)). The "state proceeding" referred to in *Juidice* clearly was the legal action in the state court. 430 U.S. at 330. Thus, the source of the bad faith exception recognized in *National*

*Farmers* suggests that the exception looks to the court proceeding below when asking whether bad faith has occurred.

### 2. Relevant Case Law.

Several cases have adopted this narrow view of the exception. In *Calumet Gaming Group-Kansas, Inc. v. The Kickapoo Tribe of Kansas*, 987 F.Supp. 1321 (D. Kan. 1997), the court confined its analysis of the bad faith exception to the actions of the Kickapoo tribe in asserting tribal court jurisdiction, and not to the tribe's alleged bad faith actions in the underlying controversy. The tribe had entered into a contractual agreement with a non-Indian consulting company ("Calumet"), but terminated the agreement and obtained a TRO in tribal court enjoining arbitration. 987 F.Supp. at 1324. Calumet sought relief for its contract claims in federal court as well as an injunction against further tribal court proceedings. *Id.* Like Plaintiff in this case, Calumet argued that the tribe, rather than the tribal court, had acted in bad faith:

> Calumet contends that the Tribe's bad faith is evidenced by its failure to pay amounts due under the consulting agreement, its refusal to give effect to the arbitration provision, its termination of the agreement without proper notice and an opportunity to cure, and its failure to abide by a "verbal" settlement agreement reached by the parties.

*Id.* at 1327. The district court held that the bad faith exception did not apply. Citing the language from *National Farmers*, the court stated that "[t]he exception requires bad faith or a desire to harass in the *assertion of tribal court jurisdiction*." *Id.* (emphasis in original). The court went on to explain that "[t]he instances of bad faith alleged by Calumet generally go to the merits of the dispute – i.e., whether the contract has been breached – instead of the Tribal Court's assertion of jurisdiction." *Id.* The court relied on the Tenth Circuit's unpublished opinion in *Harvey v. Starr*, 96 F.3d 1453 (10th Cir. 1996), which recognized the impropriety of reviewing the underlying merits of a child custody suit when determining whether the tribal court had acted in bad faith. *See* 1996 WL 511586, at *2 (10th Cir. Sept. 10, 1996).

*Landmark Golf Limited Partnership v. Las Vegas Paiute Tribe*, 49 F. Supp.2d

- 4 -

1169 (D. Nev. 1999), also involved allegations of bad faith on the part of a tribe. In *Landmark*, a tribal entity ("the Authority") had entered into separate consulting and management agreements with a non-Indian corporation ("Landmark") to develop golf courses and other recreational facilities on the reservation. 49 F. Supp.2d at 1172. Landmark alleged that the Authority fraudulently induced it to give up its rights under its original consulting agreement, including an $8,000,000 buyout provision. *Id.* As in *Calumet*, however, the district court's analysis of the bad faith exception did not extend to a review of the Authority's actions. Instead, the court concluded that the record did not show that "the tribal court's assertion of jurisdiction over this case would be made in bad faith." *Id.* at 1176.

More recently, the district court in *Rogers-Dial v. Rincon Band of Luiseno Indians*, 2011 WL 261932 (S.D. Cal. July 1, 2011), refrained from employing the bad faith exception based on underlying acts, even where the plaintiffs alleged extreme measures on the part of the tribe. The non-Indian plaintiffs alleged an unlawful scheme by the Rincon Band to drive their business operations off their leaseholds on the Rincon Band Reservation. *Id.* at *1. The plaintiffs alleged that the tribe put up concrete barriers to block them from driving in and out of their property and obtained an injunction against them in tribal court based on false accusations of environmental violations. *Id.* The court summarily rejected the bad faith exception on the basis that enforcement of the environmental statute was not in bad faith; it did not address the allegations of the underlying bad faith actions of the tribe. *Id.* at *6.

Other cases are in accord. *See Melby v. Grand Portage Band of Chippewa,* 1998 WL 1769706, at *2 (D. Minn. 1998) ("An allegation that a tribal court claim is brought in bad faith does not mean that an assertion of subject matter jurisdiction *by the tribal court* over the claim would be in bad faith") (emphasis added); *Espil v. Sells*, 847 F. Supp. 752, 757 (D. Ariz. 1994) ("The [bad faith] exception to the exhaustion rule relates to actions of courts and not the parties"); *Legg v. The Seneca Nation of Indians*, 518 F. Supp.2d 274, (D. D.C. 2007) ("the record before the Court does not offer sufficient evidence of

bad faith or intent to harass by the Peacemakers Court's assertion of jurisdiction.").

These cases confine the bad faith exception to actions of tribal courts. They decline to apply the exception when one of the parties before the tribal court can be accused of acting in bad faith.

In support of its broader reading of the exception, Plaintiff relies on language in *A&A Concrete, Inc. v. White Mountain Apache Tribe*, 781 F.2d 1411 (9th Cir. 1986), which stated that the bad faith exception did not apply because "enforcement of the statutory scheme" was not shown to be in bad faith. *Id.* at 1417. Plaintiff argues from this statement that a bad faith attempt to enforce a statute can excuse exhaustion even though such enforcement is attempted by a party rather than the tribal court. But the Ninth Circuit held in *A&A* that the appellant should have exhausted its tribal court remedies. *Id.* at 1415. The case did not address the scope of the bad faith exception, and it cited only *National Farmers* and *Juidice* in support of its single statement regarding the exception. *Id.* at 1417.

Plaintiff similarly cites a statement from *Atwood v. Fort Peck Tribal Court Assiniboine*, 513 F.3d 943, 948 (9th Cir. 2008), that "[t]here has been no showing that Defendant Hanson asserted tribal jurisdiction in bad faith or that she acted to harass Plaintiff." Plaintiff argues that this too shows that the bad faith of a party can satisfy the exception. But the Ninth Circuit in *Atwood*, as in *A&A*, did not address the scope or nature of the bad faith exception. Its only discussion of the exception is the one sentence quoted above, and its only citation is to a simple recitation of the *National Farmers* exceptions in *Nevada v. Hicks*, 533 U.S. 353, 369 (2001).

Decisions of the Ninth Circuit, of course, are binding on this Court. But the isolated statements in *A&A* and *Atwood* clearly do not constitute considered decisions that the bad faith exception includes the conduct of parties other than a tribal court. There is no indication that the parties in either case even raised this issue. The Court therefore concludes that the scope of the bad faith exception remains unresolved in this circuit, and finds the district court decisions discussed above to be more relevant to the

question that must be decided in this case.

Plaintiffs also rely heavily on *Superior Oil Co. v. United States of America*, 798 F.2d 1324 (10th Cir. 1986), a case which suggests that the bad faith analysis can apply to the actions of a tribe or tribal officials. In *Superior Oil*, non-Indian oil companies applying for permits to conduct seismic drilling on leaseholds on tribal land filed a complaint against the tribe in district court seeking declaratory and injunctive relief requiring the tribe to approve their leasehold and permit applications. 798 F.2d at 1325. The district court dismissed the action on the basis of the tribe's sovereign immunity, but the Tenth Circuit held that the district court erred in reaching this issue without first requiring the plaintiffs to exhaust their claim in tribal court. *Id.* at 1329. The Tenth Circuit remanded the case for the district court to determine

> whether the actions of the Navajo Tribe of Indians and the named individual Navajo defendants in withholding consent to assignments of leases and requests for seismic permits were taken in bad faith or motivated by a desire to harass such as to render exhaustion of Navajo Tribal Court remedies futile.

*Id.* at 1331; *c.f. Russ v. Dry Creek Rancheria Band of Pomo*, 2006 WL 2619356 (N.D. Cal. Sept. 12, 2006) ("[Plaintiffs] offer no explanation about why the *Tribe's conduct* in this case might have been in bad faith or for the purpose of harassment.") (emphasis added). Although the remand order and the language in *Russ* suggest that the bad faith inquiry extends to actions of the tribe beyond those of the tribal court, they are accompanied by virtually no analysis or explanation. Plaintiff has cited no case, and the Court has found none, where a court has invoked the bad faith exception to excuse tribal court exhaustion on the basis of conduct by a tribe or tribal council.

Plaintiff cited additional cases for the first time at oral argument on March 14. The Court also finds these cases unavailing. *Marceau v. Blackfeet Housing Authority*, 540 F.3d 916, 920 (9th Cir. 2008), stated in general terms that exhaustion is required "provided that there is no evidence of bad faith or harassment." *Marceau* cited *Atwood*, but *Atwood*, as explained above, does not represent a considered analysis of the

- 7 -

exception's scope.  *Marceau* does not address the meaning or scope of the exception.

Plaintiff argued that *Dodge v. Nakai*, 298 F.Supp. 26 (D. Ariz. 1969), shows that federal courts can assume jurisdiction where a tribal council passes punitive legislation targeted at a particular individual.  In *Nakai*, the court concluded that the Navajo Tribal Council's order excluding a former legal services director from the Navajo Reservation constituted an "unlawful bill of attainder." *Id.* at  34.  But *Nakai* predates the exhaustion requirement of *National Farmers* by sixteen years.  The Court assumes the outcome of *Nakai* would have been different had the district court been under the Supreme Court's current direction to extend comity to tribal court proceedings.

Plaintiff argued that *Johnson v. Gila River Indian Community*, 174 F.3d 1032 (9th Cir. 1999), shows that where a tribal government is dysfunctional, as Plaintiff alleges is the case here, the assertion of tribal jurisdiction would be in bad faith.  But *Johnson* dealt with the futility exception, not the bad faith exception, and found only that a party was not required to exhaust tribal remedies where it was doubtful that a functioning tribal court existed. *Id.* at 1036.  This Court previously found that Plaintiff had not made such a showing  *See* Doc. 32 at 4-5 (discussing *Johnson* and other cases and concluding that Plaintiff had not made a showing of futility).

In summary, cases that have actually addressed the scope of the bad faith exception have concluded that it looks to actions of the tribal court.  Although there is broader language in cases that have not considered the exception's breadth, those statements do not provide a persuasive basis upon which to conclude that the exception is as broad as Plaintiff contends.

### 3. The Intent of *National Farmers*.

*National Farmers* reflects an attitude of respect for tribal courts as legitimate branches of sovereign governments.  In holding that litigants seeking to invoke federal court power for the purpose of defeating tribal court jurisdiction must first exhaust their jurisdictional arguments in tribal court, the Supreme Court recognized that tribal courts are capable of resolving difficult jurisdictional issues.  471 U.S. at 856-57.  *National*

*Farmers* teaches that tribal courts should be afforded a "full opportunity" to determine their own jurisdiction, are capable of "rectifying errors," will create a more complete record for eventual federal court review, and will provide federal courts with the benefit of tribal court "expertise." *Id.* The comity *National Farmers* seeks to afford tribal courts, therefore, is more than judicial courtesy. It is based on the federal government's policy of promoting tribal self-government and on the federal courts' respect for tribal courts as judicial bodies. *Id.*

If the bad faith exception were to be expanded beyond the tribal court to include the bad faith of litigants appearing before the tribal court, exhaustion would be excused every time a party before a tribal court acts in bad faith. Such a reading of the exception would entirely disregard the judicial abilities of tribal courts and would assume they are incapable of recognizing and rectifying the bad faith of litigants before them. Such a reading would be contrary to the respect *National Farmers* extends tribal courts. Thus, the deference recognized in *National Farmers* suggests that the bad faith exception is to be construed narrowly as applying only to bad faith of the tribal court itself.

Finally, Plaintiff argued at the March 14 hearing that the exhaustion requirement is prudential rather than jurisdictional, suggesting that it is less binding and may be disregarded in the interests of equity. This argument also misunderstands the import of *National Farmers*. The question at issue was whether the Crow tribal court had jurisdiction over claims arising from a motorcycle accident in a school parking lot on the Crow reservation. *Id.* at 847. Without deciding the jurisdictional issue, the Supreme Court determined that Congress' commitment to supporting tribal self-government and self-determination "favors a rule that will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge." *Id.* at 856. Thus, the Court concluded that the existence and extent of a tribal court's jurisdiction "should be [examined] in the first instance in the Tribal Court itself." *Id.* The exhaustion rule may be prudential, but this fact does not diminish its importance as a principle of comity to be honored by federal courts. As the Ninth Circuit has explained,

- 9 -

"[t]he requirement of exhaustion of tribal remedies is not discretionary; it is mandatory." *Burlington N. R.R. Co. v. Crow Tribal Council*, 940 F.2d 1239, 1245 (9th Cir. 1991).

For all of the reasons explained above, the Court concludes that the bad faith exception focuses on the actions of the tribal court, not the actions of parties before the tribal court. The Court therefore will confine its bad faith analysis to Plaintiff's arguments regarding problems with the Hualapai Tribal Court's conduct in this case.

**III.    Applicability of the Bad Faith Exception.**

The Tribal Court has been asked to exercise jurisdiction on three occasions related to this action: (1) an action brought by Plaintiff on July 29, 2011, asking the Tribal Court to compel SNW to participate in arbitration; (2) a condemnation action brought on February 8, 2012, including a request that the Tribal Court issue a TRO preventing Plaintiff from damaging or taking property from the Skywalk; and (3) a proceeding scheduled by the Tribal Court on February 17, 2012 to hear arguments regarding the TRO.

Plaintiff has not argued, and the Court does not find, that the first action supports a showing of bad faith. In that action, brought by Plaintiff to compel arbitration, the Tribal Court ruled that it did not have jurisdiction to compel arbitration under the contract between the parties because SNW had "expressly waived sovereign immunity for the limited purpose of mandatory arbitration in federal court." Doc. 4-6, ¶ 13. The Tribal Court ruled that Plaintiff had exhausted its Tribal Court remedies and could seek redress in federal court. Doc. 4-6 at 30. Upon dismissing the case, the pro tem judge stated, "[i]f counter-intuitive and disappointing . . . the attorneys who negotiated the agreement advised SNW to specifically seek arbitration outside Hualapai jurisdiction." Doc. 4-6, ¶ 11. This demonstrates a willingness of the Tribal Court to defer to the federal court, as agreed to by the parties, rather than undertake a wrongful assertion of tribal jurisdiction.

Plaintiff argues that the next action of the Tribal Court, in which it approved a TRO against Plaintiff, shows bad faith for reasons that came to light in the Tribal Court's third action when it reconvened on February 17, 2012, to hear objections to the TRO.

Doc. 36 at 8; *see* Docs. 4-6 at 87, 91; Doc. 21-1 at 139.  In the third proceeding, Chief Judge Duane Yellowhawk, who had issued the initial TRO orders, recused himself and Associate Judge Marshall from presiding over the condemnation action due to conflicts pursuant to Ariticle VI § 10 of the Hualapai Constitution.[1]  Doc. 21-1, ¶ 5.  Judge Yellowhawk also struck the provision of the Tribe's condemnation ordinance that barred pro tem judges from presiding over the condemnation action.  He held that the provision invaded the province of the Tribal Court and violated the principle of separation of powers.  *Id.*, ¶¶ 1, 5-6.

Plaintiff argues that Judge Yellowhawk showed bad faith when he allowed the TRO to remain in place after recusing himself.  *See* Doc. 21-1 at 145: 22-24.  When Judge Yellowhawk stated that he was recusing, Plaintiff's attorneys asked that the TRO be immediately withdrawn.  Judge Yellowhawk stated "I can't make a ruling on this one."  *See* Doc. 21-1 at 146: 20-21.  Judge Yellowhawk continued to hold this position and to defend the TRO even after counsel argued that if the Tribal Constitution precluded him from ruling on withdrawing the TRO, it also invalidated the initial order that Judge Yellowhawk had signed.  *Id.* at 147: 3-9.

The Court does not agree that Judge Yellowhawk's refusal to withdraw the TRO compels a finding that the bad faith exception applies.  The Tribal Court arguably had jurisdiction to enter a TRO regarding actions on tribal land, and Plaintiff cites no authority that would compel a judge to void an otherwise valid judicial action because a conflict surfaces after it has been entered, particularly where further litigation on the issue is still pending.  The transcript of the February 17th hearing indicates that the Tribal Court and opposing counsel received Plaintiff's pleadings for the first time that day, and Judge Yellowhawk ordered a new hearing to take place March 23, giving time for the appointment of a pro tem judge and for the parties to respond to motions that had been

---

[1] The Tribal Court's order does not specify which conflicts are covered by this provision, but attorneys for Defendants stated at oral argument that Chief Judge Yellowhawk recused himself and Associate Judge Marshall because of their blood relation to members of the Hualapai Tribal Council.

filed. Doc. 21-1 at 144:21-145:3, 15-17.

Moreover, to the extent that Plaintiff argues Judge Yellowhawk should have voided the TRO immediately because his conflict suggests a bias when he entered it, allegations of bias are not sufficient to excuse exhaustion under any recognized exception. The Ninth Circuit addressed the issue of alleged bias on the part of a tribal judge in *A&A* and determined on the basis of "the plain import" of *National Farmers* that plaintiffs had to exhaust this argument in Tribal Court. 781 F.2d at 1417. Here, Judge Yellowhawk ordered that a pro tem judge be appointed to preside over further actions in this case, and Plaintiff is not foreclosed from raising arguments related to the TRO in Tribal Court after that appointment is made.

Plaintiff also argues that Judge Yellowhawk acted in bad faith when he failed to engage in an independent review of the merits of the TRO and simply signed the order as presented to him by the Tribal Council. Plaintiff raised this argument for the first time at the evidentiary hearing on March 14, after Plaintiff had been given multiple opportunities to make arguments regarding exceptions to exhaustion. This was not one of the issues on which Plaintiff requested to present evidence at the hearing; nor did Plaintiff proffer evidence showing that Judge Yellowhawk's consideration of the matter was deficient under tribal law. Judge Yellowhawk's own statement on the issue was that "we had ample time to review all the documents, plus constitutional law and our code and ordinance." Doc. 21-1 at 147:11-13. Absent citations to tribal authority concerning when and under what evidentiary showing TROs can be entered, and without a showing of what evidence the Tribal Court had before it when it issued the TRO, the Court cannot conclude that the Tribal Court issued the TRO in bad faith.[2]

Even if the Court accepts Plaintiff's allegations that Judge Yellowhawk summarily accepted the Tribe's TRO application without proper judicial review, approval of the TRO does not constitute a full-scale ratification of the Tribe's condemnation action as

---

[2] Even this Court may enter TROs *ex parte* in appropriate circumstances. *See* Fed. R. Civ. P. 65.

Plaintiff suggests. Repeatedly in its supplemental briefing on bad faith, Plaintiff alleges that Judge Yellowhawk "signed the takings orders." *See* Doc. 36 at 4, 7, 8. In fact, Plaintiff presents no evidence that Judge Yellowhawk or any other Tribal Court judge ever signed orders approving the Tribe's assertion of eminent domain. The TRO that Judge Yellowhawk signed merely prevents Plaintiff "from destroying or damaging any property located at the Grand Canyon Skywalk . . . and from taking, removing, or absconding with such property from the Hualapai Reservation." Doc. 4-6 at 87, 91. Plaintiff later insists in its motion requesting an evidentiary hearing that the TRO orders "constitute the lone judicially-executed orders by the Tribal Court in any way related to the purported condemnation at issue herein." Doc. 42 at 4. In emphasizing the unlawfulness of the Tribal Council's actions, Plaintiff goes on to state in bold print that "the Tribal Court has not issued any other order related to or authorizing the taking of GCSD's non-Indian, intangible, contract rights and interest." *Id.* at 5 (emphasis removed). Plaintiff's prior mischaracterization of Judge Yellowhawk's orders as approving the taking is an apparent attempt to show that the Tribal Court lacks independence from the Tribal Council and has acted summarily to approve the Council's alleged bad faith conspiracy to deprive Plaintiff of its contract rights. But the evidence shows, and Plaintiff emphatically agrees, that the Tribal Court has not yet considered the lawfulness of the Tribe's condemnation action.

In short, Plaintiff's arguments do not show that the Tribal Court has acted in bad faith. The Tribal Court's denial of jurisdiction over Plaintiff's motion to compel arbitration was correctly based on the Skywalk Agreement and showed deference to the parties' choice of forum. The court's recusal of judges related to members of the Tribal Council, and its striking down of the ordinance prohibiting pro tem judges from sitting on the condemnation case, were acts of judicial independence. Finally, Plaintiff has provided no tribal-law basis for the Court to conclude that the Tribal Court acted in bad faith when it approved the TRO.

Nor is the Court persuaded by Plaintiff's use of extrinsic evidence that the Tribal

Court lacks independence from the Tribal Council.  Plaintiff cites to the *Hualapai Tribal Court Evaluation Report* prepared by The National Indian Justice Center in May, 2010, recommending that the Hualapai Tribal Council issue a declaration stating that it has not and will not hear statements by individuals pertaining to pending actions in Tribal Court and advising the Tribal Council to guard against involvement in court proceedings.  Doc. 36 at 3; *see* Doc. 37-1 at 59.  The Report, however, does not indicate a lack of independence as one of the Hualapai Tribal Court's identified weaknesses.  *See* Doc. 37-1 at 56-58.  Conversely, in its evaluation of the Hualapai Tribal Court's strengths, the Report notes that "[t]he Hualapai Tribal Council understands that it is crucial that its members minimize involvement in cases pending before the tribal court.  This is the concept of separation of powers in which the decision making of the court remains free from council interference."  *Id.* at 55.  It is true, as Plaintiff notes, that the Report states that "it may take generations for a community to understand and appreciate the policy of separation of powers" (*Id.* at 59), but the Report makes this statement in the context of recommending steps to educate the community and future tribal councils.  Thus, although the Report does identify matters the Tribe must consider going forward, it does not show that the assertion of jurisdiction by the Tribal Court has been made in bad faith.[3]

Because the Court finds insufficient evidence to invoke the bad faith exception, and the Court previously found that Plaintiff's other asserted exceptions to exhaustion do not apply (Doc. 32 at 3-5), comity compels the Court to require that Plaintiff exhaust its remedies in Tribal Court.  Once a court determines that exhaustion of tribal remedies is required, it has discretion to stay or dismiss the case.  *National Farmers*, 471 U.S. at 857.

---

[3] At the March 14 hearing, Plaintiff sought to present testimony from tribe members regarding recent actions of the Tribal Council, and testimony from Joseph Myers, the expert who conducted the study upon which the Report is based.  The Court did not receive the testimony because it was outside the scope of the evidentiary hearing Plaintiff had requested and Defendants had not received notice or an opportunity to prepare witnesses in response.  The Court concludes that a hearing for such testimony is not required because the testimony of the tribe members would concern actions of the Tribal Council, not actions of the Tribal Court, and would therefore be beyond the scope of the bad faith exception.  Testimony from Mr. Myers likewise would not go to the bad faith of the Tribal Court.

The Court finds that a stay is appropriate. The Court will require the parties to file a joint status reports in six months to update the Court on the developments of this action in Tribal Court.

**IV.     Motion to Strike.**

Defendants move to strike exhibits 1 and 8 to Plaintiff's supplemental brief. Doc. 40. Defendants argue that these exhibits contain documents and information protected by attorney-client privilege and that Plaintiff's procurement and use of this information was in violation of the Arizona Rules of Professional Conduct. *Id.* The Court has reviewed the information in these exhibits and has determined that it does not affect the outcome of this decision. The Court has refrained from referencing information in these exhibits and will deny Defendants' motion as moot.

**IT IS ORDERED:**

1. Plaintiff Grand Canyon Skywalk Development Company's complaint is **stayed** in the interest of requiring Plaintiff to exhaust tribal court remedies.
2. Plaintiff's motion for an emergency TRO (Doc. 4) is **denied**.
3. Defendant's motion to strike (Doc. 40) is **denied** as moot.
4. Defendants Louise Benson, Jolene Cooney Marshall, and Sheri Yellowhawk are **dismissed**.
5. The Parties shall file a joint status report, not to exceed ten pages, by **September 10, 2012**.

Dated this 19th day of March, 2012.

_____
David G. Campbell
United States District Judge

- 15 -